1 | **ELIZABETH M. BARROS**
California Bar No. 227629
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, California  92101-5030
Telephone:  (619) 234-8467 ext. 3701
4 |

5 | Attorneys for Mr. Pereda

6 |

7 |

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE LARRY A. BURNS)**

11 | UNITED STATES OF AMERICA, ) U.S.D.C. No. 08CR1456-LAB
)
12 | ) Date:      June 16, 2008
) Time:     2:00 p.m.
13 | Plaintiff, )
) NOTICE OF MOTIONS AND MOTIONS TO:
14 | )
) (1) COMPEL DISCOVERY/ PRESERVE
15 | v. ) EVIDENCE;
) (2) DISMISS INDICTMENT DUE TO
16 | ) MISINSTRUCTION OF THE GRAND JURY;
) (3) SUPPRESS EVIDENCE UNDER THE
17 | KERMIT PEREDA-REBOLLO, ) FOURTH AMENDMENT;
) (4) SUPPRESS STATEMENTS UNDER THE
18 | ) FIFTH AMENDMENT; AND
) (5) GRANT LEAVE TO FILE FURTHER
19 | Defendant. ) MOTIONS
)
20 | )

21 | TO:       KAREN P. HEWIT, UNITED STATES ATTORNEY, AND
RANDY JONES, ASSISTANT UNITED STATES ATTORNEY.
22 |

23 |        PLEASE TAKE NOTICE that on June 16, 2008 at 2:00 p.m., or as soon thereafter as counsel

24 | may be heard, Defendant Kermit Pereda-Rebollo, by and through his attorneys, Elizabeth M. Barros and

25 | Federal Defenders of San Diego, Inc., will ask this Court to enter an order granting the following motions.

26 | //

27 | //

28 | //

## MOTIONS

Defendant Kermit Pereda-Rebollo, by and through his attorneys, Elizabeth M. Barros and Federal Defenders of San Diego, Inc., moves this Court pursuant to the United States Constitution, the Federal Rules of Criminal Procedure, and all other applicable statutes, case law, and local rules for an order to:

(1) Compel Discovery/ Preserve Evidence;

(2) Dismiss Indictment Due to Misinstruction of the Grand Jury;

(3) Suppress Evidence Under the Fourth Amendment;

(4) Suppress Statements Under the Fifth Amendment; and

(5) Grant Leave to File Further Motions.

These motions are based upon the instant motions and notice of motions, the attached statement of facts and memorandum of points and authorities, the files and records in the above-captioned matter, and any and all other materials that may come to this Court's attention prior to or during the hearing of these motions.

Respectfully submitted,

/s/ Elizabeth M. Barros
**ELIZABETH M. BARROS**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Pereda-Rebollo

Dated:  May 27, 2008

08CR1456-LAB

1 | **ELIZABETH M. BARROS**
California Bar No. 227629
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, California 92101-5030
Telephone: (619) 234-8467 ext. 3701
4 |

5 | Attorneys for Mr. Pereda-Rebollo

6 |

7 |

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE LARRY A. BURNS)**

11 | UNITED STATES OF AMERICA,  ) U.S.D.C. No. 08CR1456-LAB
                            )
12 |          Plaintiff,       ) Date:   June 16, 2008
                            ) Time:   2:00 p.m.
13 | v.                         )
                            ) **STATEMENT OF FACTS AND**
14 | KERMIT PEREDA-REBOLLO,     ) **MEMORANDUM OF POINTS AND**
                            ) **AUTHORITIES IN SUPPORT OF MOTIONS**
15 |          Defendant.       )
                            )
16 | _____)

17 | I.

18 | **STATEMENT OF FACTS**[1]

19 |         Kermit Pereda-Rebollo along with his co-defendant, Daniel Preciado, are charged in an indictment

20 | issued by the January 2007 Grand Jury with three counts of transporting illegal aliens and aiding and abetting

21 | in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). Each count arises from a vehicle stop that occurred on April 13,

22 | 2008.

23 |         According to discovery produced by the government, on April 13, 2008, at approximately 12:00 p.m.,

24 | agents received a citizen report that several suspected illegal aliens entered a dump truck near Tierra Del Sol,

25 | Boulevard, California. Agents located a vehicle matching the citizen report heading westbound on I-8 and

26 | _____

27 |         [1] This statement of facts is taken from the criminal complaint, indictment, and discovery
provided by the government. Mr. Pereda does not adopt these facts and reserves the right to
28 | challenge these facts at any future proceeding.

conducted a vehicle stop. After stopping the vehicle, the agents ordered the defendants to exit the vehicle. The defendants complied. The defendants were asked if there was anything illegal inside the vehicle, and neither responded. The defendants were instructed that a canine sniff would be performed on the vehicle. The canine alerted to the passenger side of the vehicle and the back of the truck. Agents climbed on top of the truck and observed multiple people in the bed of the dump truck. Agents questioned all of the people in the bed of the truck. They admitted they were undocumented Mexican citizens. Everyone was arrested and transported to the Campo Border Patrol Station for processing.

Around 4:45 p.m., Mr. Pereda was questioned by agents on videotape. Although a Spanish-language warning form has been produced in discovery, the form does not clearly indicate that counsel would be provided to Mr. Pereda for free if he could not afford counsel. Rather, the form states that counsel "may" or "can" be provided to him.[2] Moreover, it is clear from the video that Mr. Pereda was questioned by the agents prior to being advised of his <u>Miranda</u> rights. Finally, it appears that he was provided his administrative rights (informing him of his right to counsel at no cost to the government) prior to being provided with his <u>Miranda</u> rights. However, the agents did not advise Mr. Pereda that his administrative rights no longer applied prior to or during the videotaped interrogation.

## II.

## <u>MOTION TO COMPEL DISCOVERY AND PRESERVE EVIDENCE</u>

Mr. Pereda moves for the production by the government of the following discovery and for the preservation of evidence. This request is not limited to those items about which the prosecutor knows, but includes all discovery listed below that is in the custody, control, care, or knowledge of any government agency. <u>See generally</u> <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995); <u>United States v. Bryan</u>, 868 F.2d 1032 (9th Cir. 1989). To date, the defendant has received approximately 130 pages discovery.

1. <u>The Defendant's Statements</u>. The Government must disclose to the defendant <u>all</u> copies of any written or recorded statements made by the defendant; the substance of any statements made by the defendant which the Government intends to offer in evidence at trial; any response by the defendant to interrogation; the substance of any oral statements which the Government intends to introduce at trial and any written

---

[2] Mr. Pereda will submit a declaration in support of this assertion.

summaries of the defendant's oral statements contained in the handwritten notes of the Government agent; any response to any <u>Miranda</u> warnings which may have been given to the defendant; and any other statements by the defendant. Fed. R. Crim. P. 16(a)(1)(A) and (B). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal <u>all</u> the defendant's statements, whether oral or written, regardless of whether the government intends to make any use of those statements. **Specifically, Mr. Pereda requests that the government provide an English language translation of the videotape/ DVD depicting his interrogation.**

  2. <u>Arrest Reports, Notes and Dispatch Tapes</u>. The defense also specifically requests that all arrest reports, notes and dispatch or any other tapes that relate to the circumstances surrounding his arrest or any questioning, if such reports have not already been produced <u>in their entirety</u>, be turned over to her. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained. This is all discoverable under Fed. R. Crim. P. 16(a)(1)(A) and (B) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). <u>See also</u> <u>Loux v. United States</u>, 389 F.2d 911 (9th Cir. 1968). Arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant are available under Fed. R. Crim. P. 16(a)(1)(A) and (B), Fed. R. Crim. P. 26.2 and 12(i). Preservation of rough notes is requested, whether or not the government deems them discoverable.

  3. <u>Brady Material</u>. The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case. Impeachment and exculpatory evidence both fall within <u>Brady's</u> definition of evidence favorable to the accused. <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

  4. <u>Any Information That May Result in a Lower Sentence</u>. As discussed above, any information which may result in a more favorable sentence must also be disclosed pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The Government must disclose any cooperation or attempted cooperation by the defendant, as well as any information that could affect any base offense level or specific offense characteristic under Chapter Two of the Guidelines. Also included in this request is any information relevant to a Chapter Three adjustment, a determination of the defendant's criminal history, or any other application of the Guidelines.

5. <u>The Defendant's Prior Record</u>. Evidence of a prior record is available under Fed. R. Crim. P. 16(a)(1)(D). Counsel specifically requests a complete copy of any criminal record.

6. <u>Any Proposed 404(b) Evidence</u>. Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609. In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. Sufficient notice requires the government to "articulate <u>precisely</u> the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." <u>United States v. Mehrmanesh</u>, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); <u>see also</u> <u>United States v. Brooke</u>, 4 F.3d 1480, 1483 (9th Cir. 1993) (reaffirming <u>Mehrmanesh</u> and reversing convictions).

This includes any "TECS" records that the Government intends to introduce at trial, whether in its case-in-chief, impeachment, or rebuttal. Although there is nothing intrinsically improper about prior border crossings, they are nonetheless subject to 404(b), as they are "other acts" evidence that the government must produce before trial. <u>United States v. Vega</u>, 188 F.3d 1150, 1154-1155 (9th Cir. 1999). The defendant requests that such notice be given at least three weeks before trial to give the defense time to adequately investigate and prepare for trial.

7. <u>Evidence Seized</u>. Evidence seized as a result of any search, either warrantless or with a warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(E).

8. <u>Request for Preservation of Evidence</u>. The defense specifically requests that all dispatch tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest in this case be preserved. This request includes, but is not limited to, the results of any fingerprint analysis, the vehicle involved in the case, the defendant's personal effects, and any evidence seized from the defendant or any third party. This request also includes any material or percipient witnesses who might be deported or otherwise likely to become unavailable (e.g. undocumented aliens and transients). It is requested that the prosecutor be ordered to <u>question</u> all the agencies and individuals involved in the prosecution and investigation of this case to determine if such evidence exists, and if it does exist, to inform those parties to preserve any such evidence.

//

9.  <u>Henthorn Material</u>. The defendant requests that the Assistant United States Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved in the present case for impeachment material.  <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. 437, 438 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991). This request includes, but is not limited to, any complaints filed against the agent, whether or not the investigating authority has taken any action, as well as any matter for which a disciplinary review was undertaken, whether or not any disciplinary action was ultimately recommended.  The defendant further requests production of any such information at least one week prior to the motion hearing and three weeks prior to trial.  If the prosecutor is uncertain whether certain information should be disclosed, this information should be produced to the Court in advance of the motion hearing and the trial for an <u>in camera</u> inspection.

10.  <u>Tangible Objects</u>.  The defendant requests the opportunity to inspect, copy, and test, as necessary, all other documents and tangible objects, including photographs, books, papers, documents, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to the defendant.  Fed. R. Crim. P. 16(a)(1)(E).

11.  <u>Expert Witnesses</u>.  The defendant requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case in chief. Fed. R. Crim. P. 16(a)(1)(G).  This summary should include a description of the witness' opinion(s), as well as the bases and the reasons for the opinion(s).  <u>See</u> <u>United States v. Duvall</u>, 272 F.3d 825 (7th Cir. 2001) (finding that government's written expert notice did not adequately summarize or describe police detective's testimony in drug prosecution where notice provided only a list of the general subject matters to be covered and failed to identify what opinion the expert would offer on those subjects).  This request includes, but is not limited to, disclosure of the qualifications of any government witness who will testify that he understands and/or speaks Spanish or any other foreign language that may have been used during the course of an interview with the defendant or any other witness.

The defense requests the notice of expert testimony be provided at a minimum of three weeks prior to trial so that the defense can properly prepare to address and respond to this testimony, including obtaining

1  its own expert and/or investigating the opinions, credentials of the government's expert and obtain a hearing

2  in advance of trial to determine the admissibility of qualifications of any expert.  See Kumho v.  Carmichael

3  Tire Co., 526 U.S. 137, 119 S.Ct. 1167, 1176 (1999) (trial judge is "gatekeeper" and must determine,

4  reliability and relevancy of expert testimony).

5        12.  Impeachment evidence.  The defendant requests any evidence that any prospective government

6  witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has

7  made a statement favorable to the defendant.  See Fed. R. Evid. 608, 609 and 613.  Such evidence is

8  discoverable under Brady v. Maryland.  See United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988) (witness'

9  prior record); Thomas v. United States, 343 F.2d 49 (9th Cir. 1965) (evidence that detracts from a witness'

10  credibility).

11        13.  Evidence of Criminal Investigation of Any Government Witness.  The defense requests any

12  evidence that any prospective witness is under investigation by federal, state or local authorities for any

13  criminal conduct.  United States v. Chitty, 760 F.2d 425 (2d Cir. 1985).

14        14.  Evidence of Bias or Motive to Lie.  The defense requests any evidence that any prospective

15  government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or

16  her testimony.  Pennsylvania v. Ritchie, 480 U.S. 39 (1987); United States v. Strifler, 851 F.2d 1197 (9th Cir.

17  1988).

18        15.  Evidence Affecting Perception, Recollection, Ability to Communicate, or Veracity.  The

19  defendant requests any evidence, including any medical or psychiatric report or evaluation, tending to show

20  that any prospective witness's ability to perceive, remember, communicate, or tell the truth is impaired; and

21  any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an

22  alcoholic.  United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988); Chavis v. North Carolina, 637 F.2d 213,

23  224 (4th Cir. 1980).

24        16.  Witness Addresses.  The defense requests the name and last known address of each prospective

25  government witness.  See United States v. Napue, 834 F.2d 1311 (7th Cir. 1987); United States v. Tucker,

26  716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by counsel is ineffective); United

27  States v. Cook, 608 F.2d 1175, 1181 (9th Cir. 1979) (defense has equal right to talk to witnesses).  The

28  defendant also requests the name and last known address of every witness to the crime or crimes charged (or

1    any of the overt acts committed in furtherance thereof) who will <u>not</u> be called as a government witness.

2    <u>United States v. Cadet</u>, 727 F.2d 1453 (9th Cir. 1984).

3        17.  <u>Name of Witnesses Favorable to the Defendant</u>. The defendant requests the name of any witness

4    who made any arguably favorable statement concerning the defendant or who could not identify him or who

5    was unsure of his identity, or participation in the crime charged.  <u>Jackson v. Wainwright</u>, 390 F.2d 288 (5th

6    Cir. 1968); <u>Chavis v. North Carolina</u>, 637 F.2d 213, 223 (4th Cir. 1980); <u>Jones v. Jago</u>, 575 F.2d 1164,1168

7    (6th Cir.1978); <u>Hudson v. Blackburn</u>, 601 F.2d 785 (5th Cir. 1979), <u>cert. denied</u>, 444 U.S. 1086 (1980).

8        18.  <u>Statements Relevant to the Defense</u>.  The defendant requests disclosure of any statement that

9    may be "relevant to any possible defense or contention" that he might assert.  <u>United States v. Bailleaux</u>, 685

10   F.2d 1105 (9th Cir. 1982).  This includes Grand Jury transcripts which are relevant to the defense's potential

11   motion to dismiss the indictment.

12       19.  <u>Jencks Act Material</u>.  The defendant requests production in advance of the motion hearing or

13   trial of all material, including dispatch tapes, which the government must produce pursuant to the Jencks Act,

14   18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2.   A verbal acknowledgment that "rough" notes constitute an

15   accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under

16   section 3500(e)(1).  <u>Campbell v. United States</u>, 373 U.S. 487, 490-92 (1963); <u>see also</u> <u>United States v.</u>

17   <u>Boshell</u>, 952 F.2d 1101 (9th Cir. 1991) (holding that interview notes constitute Jencks material when an agent

18   reviews notes with the subject of the interview); <u>see also</u> <u>United States v. Riley</u>, 189 F.3d 802, 806-808 (9th

19   Cir. 1999).  Advance production will avoid the possibility of delay of the motion hearing or trial to allow the

20   defendant to investigate the Jencks material. Defendant requests pre-trial disclosure of such statements to

21   avoid unnecessary recesses and delays and to allow defense counsel to prepare for, and use properly any

22   Jencks statements during cross-examination.

23       20.  <u>Giglio Information</u>.  Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the defendant

24   requests all statements and/or promises, expressed or implied, made to any government witnesses, in exchange

25   for their testimony in this case, and all other information which could arguably be used for the impeachment

26   of any government witnesses.

27       21.  <u>Agreements Between the Government and Witnesses</u>.  The defendant requests discovery

28   regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future

1  compensation, or any other kind of agreement or understanding, including any implicit understanding relating

2  to criminal or civil income tax, forfeiture or fine liability, between any prospective government witness and

3  the government (federal, state and/or local). This request also includes any discussion with a potential witness

4  about or advice concerning any immigration benefits, any contemplated prosecution, or any possible plea

5  bargain, even if no bargain was made or the advice not followed.

6         22. Informants and Cooperating Witnesses. The defendant requests disclosure of the names and

7  addresses of all informants or cooperating witnesses used or to be used in this case, and in particular,

8  disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime

9  charged against the defendant. The government must disclose the informant's identity and location, as well

10  as disclose the existence of any other percipient witness unknown or unknowable to the defense. Roviaro v.

11  United States, 353 U.S. 52, 61-62 (1957). The government must disclose any information derived from

12  informants which exculpates or tends to exculpate the defendant.

13         23. Bias by Informants or Cooperating Witnesses. The defendant requests disclosure of any

14  information indicating bias on the part of any informant or cooperating witness. Giglio v. United States,

15  405 U.S. 150 (1972). Such information would include what, if any, inducements, favors, payments or threats

16  were made to the witness to secure cooperation with the authorities.

17         24. Personnel Records of Government Officers Involved in the Arrest. Defendant requests all citizen

18  complaints and other related internal affairs documents involving any of the immigration officers or other law

19  enforcement officers who were involved in the investigation, arrest and interrogation of Defendant. See

20  Pitchess v. Superior Court, 11 Cal. 3d 531, 539 (1974). Because of the sensitive nature of these documents,

21  defense counsel will be unable to procure them from any other source.

22         25. Training of Relevant Law Enforcement Officers. Defendant requests copies of all written,

23  videotaped or otherwise recorded policies or training instructions or manuals issued by all law enforcement

24  agencies involved in the case (Immigration and Customs Enforcement, U.S. Customs and Border Protection,

25  Border Patrol, Department of Homeland Security, etc.) to their employees regarding: (a) the handling of

26  vehicles suspected to be transporting contraband; (b) the referral to secondary inspection of persons within

27  those vehicles; (c) the detention of individuals within those vehicles; (d) the search of those vehicles and the

28  occupants of those vehicles, including the proper means of obtaining consent to search and what constitutes

consent to search; (e) the informing of suspects of their Constitutional rights; (f) the questioning of suspects and witnesses.

26. <u>Performance Goals and Policy Awards</u>. Defendant requests disclosure of information regarding standards used for measuring, compensating or reprimanding the conduct of all law enforcement officers involved in the case (Customs, Border Patrol, ICE, etc.) to the extent such information relates to the detection of contraband. This request specifically includes information concerning performance goals, policy awards, and the standards used by Customs for commending, demoting, or promoting agents for their performance at the port of entry and their success or failure to detect contraband in general.

27. <u>TECS Reports</u>. Defendant requests all TECS reports, including reports pertaining to all vehicle border crossings pertaining to the vehicle used in this case and any vehicles pertaining to Defendant.

28. <u>Reports of Scientific Tests or Examinations</u>. Pursuant to Fed. R. Crim. P. 16(a)(1)(F), the defendant requests the reports of all tests and examinations conducted upon the evidence in this case. Including, but not limited to, any fingerprint testing done upon any evidence seized in this case, that is within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

29. **<u>Narcotics/ Human Detector Dog Information</u>. Defendant moves for production of all discoverable information about any Narcotics/ Human Detector Dogs used in this case**, including information regarding: (a) the qualifications of the dogs and their handlers, (b) the training and experience of the dogs and their handlers, (c) the government's procedures regarding the treatment, training and rewarding of the dogs, (d) a detailed description of the exact method the dogs in this case used to indicate an "alert" to contraband, and (e) the location of the dogs and the vehicle when the dogs alerted, and (f) the dogs reliability.

Because this information is material to the search of the vehicle and material to the defendant's arrest, it should be produced. <u>See</u> <u>United States v. Lingenfelter</u>, 997 F.2d 632, 639 (9th Cir. 1993) (dog sniff may serve as probable cause but only if the reliability of the dog is established); <u>see also</u> <u>United States v. Rivas</u>, 157 F.3d 364, 367-68 (5th Cir. 1998); <u>see</u> <u>also</u> <u>United States v. Cedano-Arrellano</u>, 332 F.3d 568, 571 (9th Cir. 2003) (holding that district court erred in denying defendant's motion for discovery of drug-detection

1  dog's training and certification records; materials at issue were crucial to defendant's ability to assess dog's

2  reliability and to conduct effective cross-examination of dog's handler).

3      30.  <u>Residual Request</u>.  The defense intends by this discovery motion to invoke her rights to

4  discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution

5  and laws of the United States.  This request specifically includes all subsections of Rule 16. The defendant

6  requests that the government provide his and his attorney with the above requested material sufficiently in

7  advance of trial.

8                                  **III.**

9  **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS
A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH**

10  ***NAVARRO-VARGAS*** **AND** ***WILLIAMS*** **AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING
MR. PEREDA OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

11

12  **A.      Introduction.**

13      The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was

14  instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  <u>See</u>

15  Reporter's Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as

16  Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in

17  the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in

18  several ways.[3]  These instructions compounded Judge Burns's erroneous instructions and comments to

19  prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions

20  at Ex. A.  <u>See</u> Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached

21  hereto as Exhibit B.[4]

22

23      [3]  <u>See</u>, <u>e.g.</u>, <u>United States v. Cortez-Rivera</u>, 454 F.3d 1038 (9th Cir. 2006); <u>United States
v. Navarro-Vargas</u>, 408 F.3d 1184 (9th Cir.) (<u>en banc</u>), cert. denied, 126 S. Ct. 736 (2005)

24  (<u>Navarro-Vargas II</u>); <u>United States v. Navarro-Vargas</u>, 367 F.3d 896 (9th Cir. 2004)(<u>Navarro-
Vargas I</u>); <u>United States v. Marcucci</u>, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

25

26      [4]  The transcript of the voir dire indicates that grand jurors were shown a video
presentation on the role of the grand jury.  Mr. Pereda requests that the video presentation be

27  produced.  <u>See United States v. Alter</u>, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he
proceedings before the grand jury are secret, but the ground rules by which the grand jury

28  conducts those proceedings are not.").

### 1. Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[5] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which he excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, Judge Burns not only instructed the grand jurors on his view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

Examination of the voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals Judge Burns's emphasis on the singular duty to determine whether or not probable cause exists, and his statement that grand jurors cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

//

---

[5] See also id. at 20 ("You're all about probable cause.").

[T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"

If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. Pereda will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to indict in an individual case where the grand juror

1  "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See id.

2  Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

3  manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support

4  a charge even if [the CSW] thought the evidence warranted it."  See id.  Again, Judge Burns's question

5  provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of a

6  small amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand

7  juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit

8  them to vote "no bill" in the face of a showing probable cause.

9      Just in case there may have been a grand juror that did not understand his or her inability to exercise

10  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA

11  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

12  "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

13  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

14  considerations into account.

15      Well, those things -- the consequences of your determination shouldn't concern you
       in the sense that penalties or punishment, things like that -- we tell trial jurors, of
16     course, that they cannot consider the punishment or the consequence that Congress has
       set for these things.  We'd ask you to also abide by that.  We want you to make a
17     business-like decision of whether there was a probable cause. . . .

18  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went

19  on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

20      In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

21  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

22  juror is obligated to vote to indict if there is probable cause.

23      I can tell you sometimes I don't agree with some of the legal decisions that are
       indicated that I have to make.  But my alternative is to vote for someone different, vote
24     for someone that supports the policies I support and get the law changed.  It's not for
       me to say, "well, I don't like it.  So I'm not going to follow it here."
25
       You'd have a similar obligation as a grand juror even though you might have to grit
26     your teeth on some cases.  Philosophically, if you were a member of congress, you'd
       vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd
27     vote against criminalizing some drugs.

28  //

13                                          08CR1456-LAB

> That's not what your prerogative is here.  You're prerogative instead is to act like a judge and say, "all right.  This is what I've to deal with objectively.  Does it seem to me that a crime was committed?  Yes.  Does it seem to me that this person's involved?  It does."  *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

> The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers.  I'll excuse you at this time.

Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge Burns made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[6] See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

//

_____

[6]  This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

### 2. The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.[7]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

---

[7] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at 27. The instructions delivered during voir dire go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1  "the presentation of evidence to the grand jury is necessarily one-sided," <u>see</u> Ex. B at 14, Judge Burns

2  gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball.  If there's something

3  adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that." <u>See id.</u>  Thus,

4  Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was

5  "adverse" or "that cuts against the charge."  <u>See id.</u>

**B.**     **<u>Navarro-Vargas</u> Establishes Limits on the Ability of Judges to Constrain the Powers**
6
       **of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole**
7      **During Impanelment.**

8        The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

9  grand jurors in the Southern District of California.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d 1184.  While the Ninth

10  Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

11  approach[8] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

12  the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand

13  jury as set forth in <u>Navarro-Vargas II</u>.  Taken together, the voir dire of and instructions given to the January

14  2007 Grand Jury, go far beyond those at issue in <u>Navarro-Vargas</u>, taking a giant leap in the direction of a

15  bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to

16  exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  <u>See</u> <u>United</u>

17  <u>States v. Williams</u>, 504 U.S. 36, 49 (1992).

18        For instance, with respect to the grand jury's relationship with the prosecution, the <u>Navarro-Vargas</u>

19  <u>II</u> majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

20  deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

21  as a grand jury.'"  <u>Navarro-Vargas II</u>, 408 F.3d at 1200 (quoting <u>Butz v. Economou</u>, 438 U.S. 478, 510

22  (1978)).  <u>Accord</u> <u>United States v. Navarro-Vargas</u>, 367 F.3d 896, 900 (9th Cir. 2004) (<u>Navarro-Vargas</u>

23  <u>I</u>)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

24  prosecutorial.").  <u>See also</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

25  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, <u>id.</u>, but

26 

27        [8] <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
       majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
28     imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand
       jury's constitutional independence.").

1  also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

2  prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of

3  the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

4  "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

5  that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure

6  § 15.2(g) (2d ed. 1999)).

7          Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

8  in Vasquez v. Hillery, 474 U.S. 254 (1986). See id.

9              The grand jury thus determines not only whether probable cause exists, but also
               whether to "charge a greater offense or a lesser offense; numerous counts or a single
10             count; and perhaps most significant of all, a capital offense or a non-capital offense --
               all on the basis of the same facts. And, significantly, the grand jury may refuse to
11             return an indictment even "'where a conviction can be obtained.'"

12 Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's description of

13 the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls

14 not only the initial decision to indict, but also significant questions such as how many counts to charge and

15 whether to charge a greater or lesser offense, including the important decision whether to charge a capital

16 crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas II

17 majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse

18 to indict someone even when the prosecutor has established probable cause that this individual has committed

19 a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J.,

20 dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

21 dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

22 But not in Judge Burns's instructions.

23 **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established
            in Both *Vasquez* and *Navarro-Vargas II*.**

24

25          The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

26 jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

27 in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every

28 finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at

1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that he could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, he told them that if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly he was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

1    See Ex. B at 8.  Of the two sentences containing the word 'should," the latter of the two essentially states that

2    if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e]

3    room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at

4    1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting

5    the innocent.    See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

6    "responsibilities continue to include both the determination whether there is probable cause and the protection

7    of citizens against unfounded criminal prosecutions.") (citation omitted).

8         By the same token, if Judge Burns said that "the case should move forward" if there is probable

9    cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

10   Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

11   two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

12   been his intent.  But even if it were, no grand jury could ever have had that understanding.[9]  Jurors are not

13   presumed to be capable of sorting through internally contradictory instructions.  See generally United States

14   v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

15   presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

16        Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

17   clear to the grand jurors that "should" was not merely suggestive, but obligatory:

18        (1)      The first occasion occurred in the following exchange when Judge Burns conducted voir

19   dire and excused a potential juror (CSW):

20             The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't
                want you to say, "Well, yeah, there's probable cause.  But I still don't like what the
21             government is doing.  I disagree with these laws, so I'm not going to vote for it to go
                forward."  If that's your frame of mind, then probably you shouldn't serve.  Only you
22             can tell me that.
                Prospective Juror: Well, I think I may fall in that category.
23             The Court: In the latter category?
                Prospective Juror: Yes.
24             The Court: Where it would be difficult for you to support a charge even if      y o u
                thought the evidence warranted it?
25             Prospective Juror: Yes.

26   ───────────────────

27        [9] This argument does not turn on Mr. Pereda's view that the Navarro-Vargas/Marcucci
     reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on
28   the context in which the word is employed by Judge Burns in his unique instructions, context
     which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

1    The Court: I'm going to excuse you then.

2  <u>See</u> Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

3  juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case

4  "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  <u>See id.</u> ("I

5  wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment

6  was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

7  the exercise of discretion by any other prospective grand juror.

8    (2)    In an even more explicit example of what "should" meant, Judge Burns makes clear that

9  it there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

10  Court    . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

11    You'd have a similar *obligation* as a grand juror even though you might have to grit
       your teeth on some cases.  Philosophically, if you were a member of Congress, you'd
12    vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd
       vote against criminalizing some drugs.

13    That's not what your *prerogative* is here.  Your prerogative instead is act like a judge
14    and to say, "All right.  This is what I've got to deal with objectively.  Does it seem to
       me that a crime was committed?  Yes.  Does it seem to me that this person's involved?
15    It does."  *And then your obligation, if you find those things to be true, would be to vote
       in favor of the case going forward.*

16

17  <u>Id.</u> at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives

18  were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were

19  convinced there was probable cause they committed a drug offense?" <u>Id.</u> at 27.  The potential juror responded:

20  "It would depend on the case." <u>Id.</u>  Nevertheless, that juror was excused.  <u>Id.</u> at 28.  Again, in this context, and

21  contrary to the situation in <u>Navarro-Vargas</u>, "should" means "shall"; it is obligatory, and the juror has no

22  prerogative to do anything other than indict if there is probable cause.

23    Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

24  a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but

25  rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not

26  indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the

27  prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

28  scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the

1  prospective jurors, because his message is that there is no discretion not to indict.

2          (3)    As if the preceding examples were not enough, Judge Burns continued to pound the point

3  home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist

4  on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws

5  here."  See id. at 61.

6          (4)    And then again, after swearing in all the grand jurors who had already agreed to indict in

7  every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he

8  reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

9  that the evidence is sufficient' . . . . Instead your *obligation* is . . . not to bring your personal definition of what

10  the law ought to be and try to impose that through applying it in a grand jury setting."  See Ex. A at 9.

11         Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

12  penalties to which indicted persons may be subject.

13              Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the
                case is about because there is a disparity between state and federal law.
14              The Court:  In what regard?
                Prospective Juror: Specifically, medical marijuana.
15              The Court:  Well, those things -- the consequences of your determination shouldn't
                concern you in the sense that penalties or punishment, things like that -- *we tell trial*
16              *jurors, of course, that they cannot consider the punishment or the consequence that*
                *Congress has set for these things.  We'd ask you to also abide by that.*  We want you
17              to make a business-like decision of whether there was a probable cause. ...

18  See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

19  would obviously leave no role for the consideration of penalty information.

20         The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

21  penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

22  United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

23  reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

24  as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

25  ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized

26  consideration of penalty information.  See 474 U.S. at 263.

27         Nothing can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

28  again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

1  was probable cause.  These instructions go far beyond the holding of <u>Navarro-Vargas</u> and stand in direct

2  contradiction of the Supreme Court's decision in <u>Vasquez</u>.  Indeed, it defies credulity to suggest that a grand

3  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

4  <u>Vasquez</u>:

5        The grand jury does not determine only that probable cause exists to believe that a
   defendant committed a crime, or that it does not.  In the hands of the grand jury lies the

6        power to charge a greater offense or a lesser offense; numerous counts or a single
   count; and perhaps most significant of all, a capital offense or a non-capital offense –

7        all on the basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict
   in every case where a conviction can be obtained."

8

9  474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

10 dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

11 initial decision to indict, but also significant decisions such as how many counts to charge and whether to

12 charge a greater or lesser offense, including the important decision whether to charge a capital crime.").  Nor

13 would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." <u>See</u>

14 <u>id.</u> at 264.  Judge Burns's grand jury is not <u>Vasquez</u>'s grand jury.  The instructions therefore represent

15 structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

16 jury proceeding." <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must

17 therefore be dismissed.  <u>Id.</u>

18      The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the

19 instructions' excesses.  The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its

20 independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

21 decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

22 have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

23 independent."  <u>Id.</u> at 1202 (emphases in the original).

24      Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

25 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

26 of many of its decisions -- sufficiently protects that power." <u>See</u> <u>id.</u> at 1214 (Hawkins, J., dissenting).  The

27 flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

28 making a probable cause determination ... unconstitutionally undermines the very structural protections that

1 the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law

2 that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that

3 "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

4 in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

5 instructions because nothing will happen if they disobey them." Id.

6        In setting forth Judge Hawkins' views, Mr. Pereda understands that this Court may not adopt them

7 solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

8 Rather, he sets them forth to urge the Court not to extend what is already untenable reasoning.

9        Here, again, the question is not an obscure interpretation of the word "should", especially in light

10 of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

11 Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the

12 right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both

13 Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

14        Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states

15 they enjoy. He also excused prospective grand jurors who might have exercised that Fifth Amendment

16 prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex.

17 A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot embolden

18 grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience

19 of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury

20 exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government

21 by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 &

22 n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on their own

23 initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge

24 Burns has both fashioned his own rules and enforced them.

25 **D.    The Instructions Conflict with Williams' Holding That There Is No Duty to Present
     Exculpatory Evidence to the Grand Jury.**

26

27        In Williams, the defendant, although conceding that it was not required by the Fifth Amendment,

28 argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

1   exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

2   common law. See 504 U.S. at 45, 51. Williams held that "as a general matter at least, no such 'supervisory'

3   judicial authority exists." See id. at 47. Indeed, although the supervisory power may provide the authority

4   "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

5   amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

6   Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it

7   does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id.

8   at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own

9   initiative, rules of grand jury procedure." Id. at 50. As a consequence, Williams rejected the defendant's

10  claim, both as an exercise of supervisory power and as Fifth Amendment common law. See id. at 51-55.

11          Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would

12  present to them evidence that tended to undercut probable cause. See Ex. A at 20.

13              Now, again, this emphasizes the difference between the function of the grand jury and
               the trial jury. You're all about probable cause. If you think that there's evidence out
14             there that might cause you say "well, I don't think probable cause exists," then it's
               incumbent upon you to hear that evidence as well. As I told you, in most instances,
15             *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may
               be asking you to do if they're aware of that evidence.*

16

17  Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their

18  duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

19  [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See

20  id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See

21  Navarro-Vargas, 408 F.3d at 1207.

22          This particular instruction has a devastating effect on the grand jury's protective powers, particularly

23  if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

24  conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again,

25  the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

26  probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

27  would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they

28  should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

1   will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

2   cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

3   instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

4   you to do if they're aware of that evidence."  See id.  Moreover, during voir dire, Judge Burns informed the

5   jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or

6   that cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  See Ex. B at 14-15

7   (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by the

8   "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from

9   of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See

10  Ex. A at 27.

11          These instructions create a presumption that, in cases where the prosecutor does not present

12  exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

13  exculpatory evidence was presented, would proceed along these lines:

14          (1)     I have to consider evidence that undercuts probable cause.

15          (2)     The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

16                  evidence to me, if it existed.

17          (3)     Because no such evidence was presented to me, I may conclude that there is none.

18  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence

19  presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound

20  prosecutor would have presented it.

21          The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

22  prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

23  probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

24  of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

25  the Fifth Amendment.[10]

26  _____

27          [10]  Judge Moskowitz has recently ruled on a motion similar to that filed by Mr. Pereda.
            See United States v. Martinez-Covarrubias, Case No. 07CR0491-BTM, Order Denying

28          Defendant's Motion to Dismiss the Indictment, dated October 11, 2007 (attached hereto as
            Exhibit J). While Mr. Pereda disagrees with Judge Moskowitz's analysis, Judge Moskowitz at

IV.

**MOTION TO SUPPRESS EVIDENCE UNDER THE FOURTH AMENDMENT**

The Fourth Amendment of the United States Constitution guarantees the right of people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures. U.S. Const. Amend. IV.  The Fourth Amendment proscribes "unreasonable searches and seizures."  U.S. Const., amend IV. Temporary detention of individuals during the stop of an automobile, even if only for a brief period and for a limited purpose, constitutes a "seizure" within the meaning of the Fourth Amendment, and must be supported by at least reasonable suspicion.  See Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976).  Reasonable suspicion requires that the officer making the stop be "aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion."  United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc) (emphasis added).

The Fourth Amendment protection from unreasonable searches and seizures applies to persons in moving vehicles.  See United States v. Cortez, 449 U.S. 411, 417 (1981).  These protections also apply to persons driving near the United States' border with Mexico.  Roving border patrol agents must have reasonable suspicion, based on specific and articulable facts, in order to initiate a stop.  United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975); Gonzalez-Rivera v. I.N.S., 22 F.3d 1441, 1445 (1994). "Reasonable suspicion requires that the specific facts and inferences create suspicion 'that the particular

---

least recognizes that a portion of the instruction is error, although he incorrectly found that it was not structural. Ex. J at 11. Because, under Judge Moskowitz's analysis, this Court must determine whether the error was harmless, Mr. Pereda asks that this Court order the government to produce the transcripts of the grand jury proceedings that resulted in the instant indictment. The Court may order disclosure of grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).  The Ninth Circuit requires a "particularized need" to justify disclosure, see United States v. Walczak, 785 F.2d 852, 857 (9th Cir. 1986), but that need cannot be any different than the standard set for in Rule 6(e)(3)(E)(ii): Mr. Pereda need only show that "a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added).  That is why the Rule's "general suggestion [is] in favor of disclosure."  See Walczak, 785 F.2d at 857.  Here, under Judge Moskowitz's approach to Judge Burns' erroneous instruction, it is clear that, at the very least, "a ground may exist to dismiss the indciment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).

1   person detained is engaged in criminal activity.'" United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1493

2   (9th Cir. 1994). Simply put, an officer must have a *particularized and objective basis of criminal activity* in

3   order to detain a motorist. Cortez, 449 U.S. at 417-418. "Founded suspicion must exist at the time the officer

4   initiates the stop." United States v. Salinas, 940 F.2d 392, 394 (9th Cir. 1991) (citations omitted).

5          Because the Border Patrol agent or agents who initiated and performed the stop in this case did not

6   have the requisite suspicion that the Constitution demands, the stop of Mr. Pereda and his co-defendant

7   violated their Fourth Amendment rights. Even if the agents had reasonable suspicion to stop the truck, the

8   agents did not have probable cause to search the truck. Therefore, all evidence obtained by the agents as a

9   result of the stop and search of the truck, as well as the subsequent interrogations of the defendants and the

10  material witnesses must be suppressed.

11  **A.     This Court Should Suppress All Evidence Obtained as a Result of the Vehicle Stop on
           April 13, 2008 Because Agents Lacked Reasonable Suspicion to Conduct the Stop.**

12

13         According to Report of Investigation from April 13, 2008, agents stopped the dump truck Mr. Pereda

14  was driving based on a citizens report that suspected illegal aliens had entered the truck. Immediately upon

15  stopping the truck, agents ordered Mr. Pereda and the co-defendant to exit the vehicle, thus further restricting

16  their movement.

17              **1.     The government bears the burden of justifying this warrantless seizure**

18         As the Report of Investigation makes clear, agents seized Mr. Pereda without a warrant. That seizure

19  is therefore presumptively unreasonable. See United States v. Hawkins, 249 F.3d 867, 872 (9th Cir. 2001).

20  It is the government's burden to demonstrate that its agents complied with the Fourth Amendment. See id.

21              **2.     Agents lacked reasonable suspicion to Stop and Detain Mr. Pereda.**

22         According to the Report of Investigation, agents stopped the dump truck Mr. Pereda was driving

23  because they received a citizens report that suspected illegal aliens had entered the vehicle. No further details

24  are provided in the report of investigation.

25         A citizen report, like the one relied upon by the agents in this case, is insufficient to establish

26  reasonable suspicion for a stop. In Florida v. J.L., 529 U.S. 266 (2000), the Supreme Court confronted this

27  very issue. There, the Supreme Court assessed the reliability of an anonymous tip that a black male, standing

28  at a bus stop, wearing a plaid shirt, possessed a firearm. Id. at 271. In J.L., as here, there was no audio

recording of the call or other documentation of the call in the record and nothing was known about the anonymous informant. The Court held that a tip identifying an individual as carrying contraband, without more, did not provide reasonable suspicion justifying a *Terry* stop and frisk. Id. at 268. The Court specifically rejected the argument that prompt verification of the description of a particular person at a particular location rendered the tip sufficiently reliable. Id. at 272. Rather, the Court held that the reasonable suspicion standard requires that a tip be reliable in its assertion of illegality as well as its tendency to identify a determinate person. Id. at 272.

Here, there is no record of the citizen report allegedly received by border patrol. However, even assuming a report was received, there is no evidence that the border patrol agents had information establishing its reliability in its assertion of illegality. The tip provided only information regarding the general location of the truck, and did not provide any predictive information making it reasonable for the police to believe that the informant had inside knowledge about the defendants and that the assertion of criminal activity was credible. Thus, the alleged citizen report was not sufficiently reliable to establish reasonable suspicion. Because the citizens report relied upon by the agents to initiate the stop does not establish reasonable suspicion, this Court must suppress all evidence derived from the stop of Mr. Pereda pursuant to Wong Sun v. United States, 371 U.S. 471 (1963), including his subsequent statements, as well as the statements of the material witnesses and the co-defendant.

**3.      Mr. Pereda's Fourth Amendment Rights Were Violated When Border Patrol Agents Searched the Vehicle Without His Consent and Without Probable Cause.**

Even assuming for the sake of argument that agents had reasonable suspicion to stop Mr. Pereda, the agents did not have probable cause to search the vehicle. "[T]he Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." United States v. Ross, 456 U.S. 798, 822-823 (1982) (citing Robbins v. California, 453 U.S. 420, 427 (1981)). "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Ross, 456 U.S. at 825 (citations omitted).

Pursuant to the "automobile exception," officers may search a vehicle only if they have probable cause to believe that the vehicle contains contraband. Id. at 807-809. Absent probable cause, officers cannot

1   search a vehicle or its contents unless they first obtain the person's consent.

2       Here, the agents stopped the dump truck, ordered the defendants to exit, told them that a canine sniff

3   would be performed and then searched the back of the truck without the defendants' consent. Although the

4   government may argue that the canine alerted, thus providing the agents with probable cause for the search,

5   a dog sniff may serve as probable cause only if the reliability of the dog is established.  See United States v.

6   Lingenfelter, 997 F.2d 632, 639 (9th Cir. 1993).  Therefore, Mr. Pereda is entitled to a hearing on the

7   reliability of the canine.  Absent a sufficient showing by the government as to the reliability of the dog, this

8   Court must suppress any evidence derived from the search of the vehicle, even if there was reasonable

9   suspicion for the initial stop.

10                                          **V.**

11  **THIS COURT SHOULD SUPPRESS MR. PEREDA'S STATEMENTS UNDER THE FIFTH
    AMENDMENT**

12

13  **A.    This Court Should Suppress Mr. Pereda's Statements Because The Government Has Not
          Offered Any Evidence That Mr. Pereda Was Properly Advised of His *Miranda* Rights or**

14  **Knowingly and Intelligently Waived Them.**

15      The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a

16  custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to

17  secure the privilege against self-incrimination.  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  Custodial

18  interrogation is questioning initiated by law enforcement officers after a person has been taken into custody

19  or otherwise deprived of his freedom of action in any significant way. Id. See Orozco v. Texas, 394 U.S. 324,

20  327 (1969).

21      Once a person is in custody, Miranda warnings must be given prior to any interrogation.  See

22  United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980).  Those warnings must advise the

23  defendant of each of his or her "critical" rights.  United States v. Bland, 908 F.2d 471, 474 (9th Cir. 1990).

24  "In order for the warning to be valid, the combination or the wording of its warnings cannot be affirmatively

25  misleading."  United States v. San Juan Cruz, 314 F.3d 384, 387 (9th Cir. 2003) (citing United States v.

26  Connell, 869 F.2d 1349, 1352 (9th Cir. 1989)).   "The warning must be clear and not susceptible to

27  equivocation."  Id.  See also id. at 389-90 (vacating illegal entry conviction where defendant was advised of

28  his administrative rights from an I-826 form and later advised of his Miranda rights).

1    Both the Supreme Court and the Ninth Circuit have recognized that the requirements of Miranda,

2  384 U.S. 436 are not a mere formality.  In Tague v. Louisiana, 444 U.S. 469 (1980) (per curiam), the State

3  offered a witness who testified that he read the defendant his rights from a card, but that he could not recall

4  the content of the rights, he could not remember if the defendant said he understood, and he could not

5  remember if the defendant was literate.  See id. at 652.  Although the state court held that "'the burden is on

6  the one claiming a lack of capacity to show that lack,'" id. at 653 (citations omitted), Tague held that the state

7  court's approach "creates a presumption that the defendant understood his constitutional rights and places the

8  burden of proof upon the defendant, instead of the state, to demonstrate whether the defendant knowingly and

9  intelligently waived his privilege against self-incrimination and this right to retained or appointed counsel."

10  See id. (citation omitted).

11    Tague declined to overrule Miranda and adopt that presumption.

12    Since the State is responsible for establishing the isolated circumstances under which the
       interrogation takes place and has the only means of making available corroborated evidence
13    of warnings given during incommunicado interrogation, the burden is rightly on its
       shoulders.

14

15  Id. (quoting Miranda, 384 U.S. at 475).  Tague concluded, in a case in which the State offered at least *some*

16  evidence -- here there is none -- that "[i]n this case no evidence at all was introduced to prove that the

17  petitioner knowingly and intelligently waived his rights before making the inculpatory statement.  The

18  statement was therefore inadmissible."  See id.  Accord Terrovona v. Kincheloe, 912 F.2d 1176, 1180 (9th

19  Cir. 1990) ("the prosecution must show both that the defendant was informed of his or her rights and that the

20  defendant waived those rights") (citing United States v. Ramirez, 710 F.2d 535, 542 (9th Cir. 1983)).  See also

21  United States v. Arbolaez, 450 F.3d 1283, 1292 (11th Cir. 2006) (per curiam) (reversing where the defendant

22  contended that "the government failed to show that Arbolaez actually understood his Miranda rights and

23  waived them 'voluntarily, knowingly and intelligently'" because the district court erroneously failed to

24  conduct a hearing).

25    These cases establish that it is the government's burden to present evidence that Mr. Pereda was

26  advised of his rights and that he knowingly waived them.  Because the government has presented no such

27  evidence, Mr. Pereda's statements must be suppressed.

28  //

**B.      Mr. Pereda's Statements Must Be Suppressed Because Any Warnings That Were Provided Were Legally Insufficient.**

There are at least two major flaws in the form used in this case which alone require suppression of his statements: the form does not make it clear that an indigent suspect *will* be appointed counsel *at no expense* to him.

San Juan Cruz makes clear that the right to appointed counsel cannot be conveyed in a confusing manner. See 314 F.3d at 388 ("Requiring someone to sort out such confusion is an unfair burden to impose on an individual already placed in a situation that is inherently stressful."). Accord United States v. Perez-Lopez, 348 F.3d 839, 848 (9th Cir. 2003). The form produced in discovery in this case states: If you do not have money to hire a lawyer, one *may* [or can] be provided for you before any questioning, if you wish. That statement does not reflect that an attorney *will* be appointed by the court, nor does it make clear that the attorney, if provided, would be provided at no expense to the indigent defendant.

In Perez-Lopez, 348 F.3d 839, the Ninth Circuit analyzed whether a similar warning satisfied the requirements of Miranda. There, the defendant was advised: "you have the right to solicit the court for an attorney if you have no funds." Id. at 847. On appeal, the Ninth Circuit found the warning to be legally insufficient because it implied the possibility that counsel might not be appointed. Id. at 848. The Ninth Circuit emphasized that the warning must clearly convey "the government's *obligation* to appoint an attorney for indigent accused." Id. (emphasis in original). Here, as in Perez-Lopez, the warning is constitutionally infirm because it does not convey the government's obligation to appoint an attorney, but rather, leaves open the possibility that counsel might not be appointed.

The warning is also constitutionall infirm because, as in San Juan Cruz, it does not clearly convey that an attorney will be provided at no cost. "[T]he warning ... must make clear that if the arrested party would like to retain an attorney but cannot afford one, the government is obligated to appoint an attorney for free." San Juan Cruz, 314 F.3d at 388. The warning here does not say that the attorney ultimately provided will be free. Thus, the warning is defective. See id. Moreover, it appears from discovery that Mr. Pereda was provided with his administrative warnings, which the agents failed to tell him no longer applied prior to or during the videotaped interrogation, which is also a violation of San Juan Cruz.

//

1 **C.      Mr. Pereda's Statements Must Be Suppressed Under *Missouri v. Seibert*.**

2          The statements must also be suppressed because, assuming the <u>Miranda</u> warnings were actually

3 given, it is apparent from the videotape that they were withheld until after Mr. Pereda had already been

4 questioned and confessed.[11]  "The threshold issue when interrogators question first and warn later is thus

5 whether it would be reasonable to find that in these circumstances the warnings could function 'effectively'

6 as <u>Miranda</u> requires."  <u>Missouri v. Seibert</u>, 542 U.S. 600, 611-612 (2004) (plurality).  "By any objective

7 measure" where interrogators withhold warnings until after interrogation succeeds in eliciting a confession,

8 "the warnings will be ineffective in preparing a suspect for successive interrogation, close in time and similar

9 in content."  <u>Id</u>.  Unless the warnings could place a suspect who has just been interrogated in a position to

10 make an informed choice to stop talking even if he had talked earlier, "there is no practical justification for

11 accepting the formal warnings as compliance with <u>Miranda</u>, or for treating the second stage of interrogation

12 as distinct from the first. . ."  <u>Id</u>.  Thus, "it would ordinarily unrealistic to treat two spates of integrated and

13 proximately conducted questioning as independent interrogations subject to independent evaluation simply

14 because <u>Miranda</u> warnings formally punctuate them in the middle.  <u>Id</u>. at 614.

15          There is no reason here to believe that Mr. Pereda believed he had a real choice to stop talking.  It

16 is clear that he was questioned twice by agents.  The agents reference previous statements made by Mr. Pereda

17 during the videotaped interrogation, thus reminding Mr. Pereda that he had previously made an incriminating

18 statement.  Under the circumstances, this Court should suppress Mr. Pereda's statements as obtained in

19 violation of the Fifth Amendment.

20 **D.      <u>Mr. Pereda Requests That This Court Conduct An Evidentiary Hearing</u>.**

21          This Court must make a factual determination as to whether a confession was voluntarily given prior

22 to its admission into evidence.  18 U.S.C. § 3501(a).  Where a factual determination is required, courts are

23 obligated by Fed. R. Crim. P. 12 to make factual findings.  <u>See</u> <u>United States v. Prieto-Villa</u>, 910 F.2d 601,

24 606-10 (9th Cir. 1990).  Because "'suppression hearings are often as important as the trial itself,'" <u>id.</u> at 609-

25 10 (quoting <u>Waller v. Georgia</u>, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not

26

27          [11]  Mr. Pereda has not yet received a translation of the videotaped interrogation, which

28 occurs in both English and Spanish. Mr. Pereda will provide a transcript of the interrogation to
this Court upon receipt.

1 merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.[12]

2    Under section 3501(b), this Court must consider various enumerated factors in making the

3 voluntariness determination, including whether the defendant understood the nature of the charges against him

4 and whether he understood his rights.  Without the presentation of evidence, this Court cannot adequately

5 consider these statutorily mandated factors. Mr. Pereda accordingly requests that this Court conduct an

6 evidentiary hearing pursuant to 18 U.S.C. § 3501(a), to determine, outside the presence of the jury, whether

7 any statements made by him were voluntary.

8                                    **VI.**

9                **MOTION FOR LEAVE TO FILE FURTHER MOTIONS**

10    Mr. Pereda has received 130 pages of discovery.  Mr. Pereda believes that discovery is not yet

11 complete and respectfully requests the opportunity to file further motions and/or supplement the motions

12 already filed after reviewing additional discovery and conducting independent investigation.

13                                    **VII.**

14                                **CONCLUSION**

15    For the foregoing reasons, Mr. Pereda respectfully requests that the Court grant the above motions.

16                        Respectfully submitted,

17

18 Dated:  May 27, 2008              /s/ Elizabeth M. Barros
                                    **ELIZABETH M. BARROS**
19                                  Federal Defenders of San Diego, Inc.
                                    Attorneys for Mr. Pereda

20

21

22

23

24

25

26    [12]  An evidentiary hearing is the only way to assure that there is a complete and impartial
determination of whether the defendant knowingly and voluntarily waived his rights.  Surely, this
27 Court would not rely on the unsworn assertions of the *opposing* party in determining whether the
waiver of the Sixth Amendment right to counsel was knowing and voluntary.  The waiver of
28 important rights guaranteed by the Fifth Amendment should be no different.